**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MARYAM ALRAZZAQ,         )
                                )
            Plaintiff,      )       Case No. 12-cv-07560
                                )
    v.                       )       Judge John Z. Lee
                                )
WALGREEN CO. d/b/a       )       Magistrate Judge Young B. Kim
WALGREEN PHARMACY SERVICES  )
EASTERN,                   )
            Defendant.    )

**DEFENDANT'S LOCAL RULE 56.1(a)(3) STATEMENT
OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE**

Defendant, Walgreen Co. ("Walgreens"), pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1(a)(3), submits the following statement of material facts as to which there is no genuine issue.[1]

### Parties, Claims, Jurisdiction, and Venue[2]

1.      This is an action brought by Plaintiff, Maryam Alrazzaq, against her former employer, Walgreens, under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII"). (Pl.'s Compl., ¶ 1.) Specifically, Plaintiff has alleged

---

[1] Walgreens contests some of the facts presented in this statement, but for purposes of its Motion for Summary Judgment, Walgreens is adopting Plaintiff's version of certain contested facts. Walgreens reserves the right to contest any of the facts in this statement for any purposes other than its Motion for Summary Judgment. This statement of facts will be cited in Walgreens's Memorandum in Support of Its Motion for Summary Judgment as "Facts ¶___."

[2] The record foundation for all facts in this statement is attached hereto as follows:

| Description | Exhibit |
|---|---|
| Plaintiff's Deposition ("Pl.'s Dep.") (Exhibits from Plaintiff's Deposition ["Def. Ex. ___"] are included as part of Exhibit A behind numeric tabs corresponding to the Exhibit Numbers.) | A |
| Binita Patel's Deposition ("Patel's Dep.") (Exhibits from Ms. Patel's Deposition ["Patel's Dep. Ex. ___"] are included as part of Exhibit B behind numeric tabs corresponding to the Exhibit Numbers.) | B |
| Paul Krynski's Deposition ("Krynski's Dep.") (Exhibits from Mr. Krynski's Deposition ["Krynski's Dep. Ex. ___"] are included as part of Exhibit C behind numeric tabs corresponding to the Exhibit Numbers.) | C |
| Paul Krynski's Declaration ("Krynski's Decl., ¶___") (Exhibits to Mr. Krynski's Declaration ["Krynski's Decl. Ex. ___"] are included as part of Exhibit D behind numeric tabs corresponding to the Exhibit Numbers.) | D |
| Binita Patel's Declaration ("Patel's Decl., ¶___") (Exhibits to Ms. Patel's Declaration ["Patel Decl. Ex. ___"] are included as part of Exhibit E behind numeric tabs corresponding to the Exhibit Numbers.) | E |

that Walgreens terminated her employment because of her gender (pregnancy), religion (Muslim), and national origin (Palestinian-Arab). (*Id.*, Counts I-III, ¶¶ 1, 37-38.)

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because Plaintiff has alleged a violation of a federal statute (i.e., Title VII), and venue is proper because the alleged discriminatory act is alleged to have occurred at one of Walgreens's stores located in the Northern District of Illinois. (*Id.*, ¶¶ 1, 4, 6.)

*Plaintiff's Education, Professional Licenses,*
*Work History, and Job Responsibilities as a Staff Pharmacist*

3.      Plaintiff obtained her Pharmacy Technician license in 1996, a Bachelor's degree in Pharmacy in 2001, her Pharmacy license in 2001, and a Doctorate in Pharmacy in 2002. (Pl.'s Dep. at 12-13 [Ex. A].)

4.      Walgreens hired Plaintiff as a Pharmacy Intern in January 2001, and she worked in that position until she obtained her Pharmacy license later that year, at which time she became a Staff Pharmacist. (Pl.'s Dep. at 14-18 [Ex. A].) Plaintiff held the position of Staff Pharmacist until the termination of her employment in late April 2012. (Pl.'s Dep. at 14-18, 209-210 [Ex. A].)

5.      In the position of Staff Pharmacist, Plaintiff's required job responsibilities and skills included the following:

JOB RESPONSIBILITIES/TASKS:

1. *Reviews and verifies prescriptions to include fully utilizing pharmacy systems, ensuring information is entered correctly, verifying medicine is correct,* weighing and counting pills, and checking for possible interactions.

. . . .

8. *Ensures the proper processing of insurance claims* including following and instructing staff on procedures, monitoring progress, and calling insurance companies to help resolve insurance

problems to lessen payment rejections and charge-backs, and heighten customer satisfaction.

9. *Adheres to government laws and regulations, corporate policies and procedures, ethics and codes of conduct.*

. . . .

11. *Provides immunizations*, diabetes awareness, and other preventative health care services as needed.

. . . .

14. *Maintains knowledge and skill in the fields of pharmacy* and healthcare, reads pharmacy related journals, *reads company publications and communications, completes People Plus Learning modules and continuing education credits, researches new drugs*, attends district meetings, etc.

15. Obtains necessary certifications and *completes other training required by the company.*

. . . .

20. *Assists Pharmacy Manager in training employees*, including new hire orientation, on-the-job training, cross training, answering questions, *determining training needs, following up to ensure training is used, and coaching informally.*

. . . .

KNOWLEDGE, SKILLS and ABILITIES: (* denotes not required at entry to the job)

. . . .

• *Knowledge of state and federal pharmacy laws and regulations for taking and dispensing prescriptions.*

• *\*Knowledge of pharmacy products, services, and operations.*

. . . .

• *Multitasking and time management skills to handle multiple tasks at once and work in a pharmacy.*

• *Judgment and decision making skills to make decisions on drugs,* interactions, customer service, inventory, etc.

. . . .

• *Ability to learn, retain, and apply new information.*

• *Ethics to behave appropriately and morally in dispensing prescriptions* and in the treatment of others.

. . . .

(Pl.'s Dep. at 18 [Ex. A]; Def. Ex. 20 [Ex. A] [emphasis added].)

6.     During the seven years preceding the termination of her employment in late April 2012 (i.e., approximately 2005 through late April 2012), Plaintiff worked as a Staff Pharmacist at a Walgreens store located in Hometown, Illinois (the "Store"). (Pl.'s Dep. at 18, 209-210 [Ex. A].)

7.     From December 2010 through the termination of Plaintiff's employment in late April 2012, she reported to Binita Patel, the Store's Pharmacy Manager. (Pl.'s Dep. at 18-19 [Ex. A]; Patel's Dep. at 16 [Ex. B].) During the same time period, Plaintiff reported indirectly to Paul Krynski, who held the position of Pharmacy Supervisor for the entire District encompassing the Store and approximately 25 other stores. (Pl.'s Dep. at 19 [Ex. A]; Krynski's Dep. at 15-19, 86-87 [Ex. C].) Mr. Krynski reported to the District Manager, Anas Al-Hamwi. (*Id.*)

### Walgreens' Training Program

8.     Walgreens is the nation's largest drugstore chain, and its mission statement highlights the importance of consumer trust:

> To be the *most trusted*, convenient, multichannel provider and advisor of innovative pharmacy, health and wellness solutions, and consumer goods and services in communities across America.

(Krynski's Decl., ¶3 [Ex. D].)

9. The Walgreens Pharmacy and Health Care Code of Conduct and General Training also emphasizes the importance of honesty, trust, and compliance with Company policies and applicable law:

> *A violation of applicable law, regulation, or this Code of Conduct may subject a team member to* criminal, civil, or administrative penalties, *as well as disciplinary action by Walgreens*, *up to and including termination of employment.* . . . .
>
> *Honesty and integrity are the keystones* that have kept our company strong for more than a century and are *the fundamental principles upon which we operate. Our customers trust us with their health and well being as well as that of their loved ones.* They *trust us* to provide professional, sensitive and high quality services in meeting their health care needs. They trust that we are honest in all of our dealings and that we will respect their right to privacy. They trust that we will safely handle the medications that our patients require but which, if used inappropriately, can cause great harm. Walgreens expects that team members will maintain the *highest standards of ethical behavior and professional conduct.* Walgreens team members *will conduct all of their activities in a manner that complies with the spirit and the intent of all laws, policies and ethical codes* under which we operate. Walgreens team members must *do what is right* and behave in such a manner that others will view them as having *the highest standards in both professional and personal behavior.* . . . .
>
> Walgreens *is committed to requiring that all pharmacy* and other health care team members *must comply* with all applicable federal health care program requirements, *with applicable Walgreens policies and procedures*, and with any applicable Corporate Integrity Agreements. . . . .
>
> Walgreens believes that there is no better way to *ensure public trust* in our company than through the knowledge and commitment of each team member to *the ethical principles* to which we subscribe. To that end, this Code of Conduct contains certain, but not all, of *the ethical and legal requirements* to which *Walgreens team members must adhere.* Although this Code of Conduct does not contain an all-inclusive listing of Walgreens ethical and legal expectations for team members, It does serve as a guide. . . . .
>
> All Walgreens team members working in a pharmacy or handling controlled substances must: . . . . *Comply fully with all applicable*

> *state and/or federal law, as well as company policies and procedures. . . .*
>
> Team members should feel free to report what they believe, in good faith, to be violations of the law, this Code of Conduct, or other act of misconduct without fear of retaliation. Team members should report or discuss such violations with his or her choice of Store or Department Manager, District Manager or Department Director, Vice President, District Loss Prevention Manager, Chief Compliance Officer of the Company, or the Company's confidential hotline at 1-800-666-5677. . . . . Walgreens prohibits retaliation against any team member who makes a compliance report in good faith. Anyone retaliating against any team member who makes a compliance report in good faith shall be subject to discipline, including, in appropriate cases, termination of employment.

(Krynski's Decl., ¶7 [Ex. D]; Krynski's Decl. Ex. 1 [Ex. D].)

10.     As part of its quality control efforts, Walgreens requires all of its 240,000-plus employees to complete from time to time throughout their tenure various training modules covering a wide variety of topics, some of which apply to all employees (e.g., "Welcome to Walgreens Online Orientation," "Sale of Alcoholic Beverages Policy"), and some of which are job-specific (e.g., "Flu and Pneumonia Immunization Program Overview," "Pharmacy Plus (Parts 1-4) Tutorial," "VISION – Verify Rx – Imaging Store"). (Pl.'s Dep. at 21-22, 24-25 [Ex. A]; Def. Ex. 31 [Ex. A]; Krynski's Decl., ¶4 [Ex. D].)

11.     All Company policies and required protocols are available to all employees through Walgreens' intranet, called "StoreNet." (Pl.'s Dep. at 22 [Ex. A].)

12.     Most training modules are provided through a program called "People Plus Learning" (also known as "PPL"), the successful completion of which modules is tracked electronically by Walgreens. (Pl.'s Dep. at 24-25, 38-39 [Ex. A]; Def. Ex. 31 [Ex. A].)

13.     Other training modules available through StoreNet require the review of a Microsoft PowerPoint presentation. (Pl.'s Dep. at 21-22, 39 [Ex. A].)

14.     There are four computers in the Store's Pharmacy area, and one computer in the Store's Office, through which the Pharmacy staff can access StoreNet to complete the required training modules. (Pl.'s Dep. at 22-24 [Ex. A].)

15.     There are also printers available at the Store to print hard copies of training materials, and Plaintiff has printed training materials so that she could review the training information in hard-copy format. (Pl.'s Dep. at 39-40 [Ex. A].)

16.     On weekdays, there is a two-hour overlap during which there are two Pharmacists on the Store's premises (unless one of the Pharmacists has to attend a meeting at the District Office, which occurred one to two times per month while Plaintiff was employed). (Pl.'s Dep. at 29-33 [Ex. A].)

17.     Walgreens schedules this two-hour overlap so that the two Pharmacists can "break" each other for their lunches, complete required training, and perform other duties that may take them away from the Pharmacy area. (P. Krynski's Decl., ¶5 [Ex. D].)

18.     The Pharmacy staff also was expected to complete required training during time periods in which the Pharmacy was not busy. (P. Krynski's Decl., ¶6 [Ex. D].)

19.     During Plaintiff's tenure, she completed almost 200 PPL modules at various times, including during the two-hour overlap, during breaks, during periods when the Pharmacy was not busy, before the scheduled start of her shift, and after the scheduled end of her shift. (Pl.'s Dep. at 24-25, 29-36, 38-39 [Ex. A]; Def. Ex. 31 [Ex. A].)

*The Zostavax Training, Eligibility Requirements, and Protocol for Administering*

20.     In or around early November 2011, Walgreens made available to the Store's Pharmacy staff through StoreNet a Microsoft PowerPoint training presentation regarding

Zostavax (the "Zostavax Presentation"), a new live attenuated virus vaccine indicated for the prevention of herpes zoster (shingles). (Pl.'s Dep. at 52, 55-56 [Ex. A]; Def. Ex. 21 [Ex. A].)

21.     In or around late November 2011, Ms. Patel had a conversation with Plaintiff during which she asked Plaintiff to "complete the training" in reference to the Zostavax Presentation, she made reference to a document on the work counter in the Pharmacy that stated at the top "please sign and date" (the "Training Acknowledgment Form"), and she advised Plaintiff to "make sure we [the Pharmacy staff] sign it afterwards" (i.e., after completing the training). (Pl.'s Dep. at 40-47[Ex. A]; Def. Ex. 4 [Ex. A]; Patel's Dep. at 62 [Ex. B]; Patel's Dep. Ex. 6 [Ex. B].)

22.     Plaintiff understood that in order to complete the training, she was required to read the Zostavax Presentation. (Pl.'s Dep. at 52, 121 [Ex. A].)

23.     The Zostavax Presentation contained the following important information regarding patient age restrictions: The Pharmacist is responsible for determining whether a patient is eligible to receive the Zostavax (Pl.'s Dep. at 52 [Ex. A]; Def. Ex. 21, at D104 [Ex. A].) Pharmacists are only authorized to administer Zostavax to patients who are within the U.S. Food and Drug Administration-approved age indications, meet the Center for Disease Control Advisory Committee on Immunization Practices' (the "ACIP's") recommendations, and meet the State age restrictions. (*Id.* at D107.) Specifically, Pharmacists are only authorized to administer Zostavax to patients age 50 or older and, in the case of patients age 50-59, the patient must have a patient-specific prescription for the Zostavax. (*Id.* at D107, D107.1, D107.2, D107.3, D107.5, D107.6, D107.7.) These specific age requirements are expressly referenced in *six separate, consecutive slides* of the Zostavax Presentation. (*Id.* at D107.1, D107.2, D107.3, D107.5, D107.6, D107.7.)

24.     The Zostavax Presentation contained the following important information regarding the use of the Vaccine Administration Record ("VAR"), which is a form that is required to be completed by the patient for purposes of determining the patient's eligibility to receive the vaccine:  Prior to reconstituting (i.e., mixing and preparing for injection) the Zostavax dose, the Pharmacist is required to review the patient's VAR to ensure the patient is eligible to receive the vaccine.  (*Id.* at D119 ["Prior to reconstituting the Zostavax dose . . . [r]eview the VAR to ensure the patient is eligible to receive the vaccine"], D128). Among other information, the VAR requires the patient to list his/her date of birth and age. (Pl.'s Dep. at 154, 173 [Ex. A]; Ex. 11 [Ex. A].)

25.     The Zostavax Presentation contained the following important information relating to the Vaccine Information Statement ("VIS"), which contains information regarding the vaccine:  Prior to reconstituting the Zostavax dose, the Pharmacist is required to allow the patient to review the VIS and ask any questions.  (Pl.'s Dep. at 52 [Ex. A]; Def. Ex. 21, at D119 ["Prior to reconstituting the Zostavax dose . . . [a]llow the patient to review the VIS and ask any questions"] [Ex. A].)

26.     The Zostavax Presentation contained the following important information relating to the Pharmacist's information verification responsibilities:  Prior to reconstituting the Zostavax dose, the Pharmacist is responsible for verifying the patient, prescription, immunization, and insurance information entered into IntercomPlus, Walgreens' proprietary pharmacy computer system. (Pl.'s Dep. at 52 [Ex. A]; Def. Ex. 21, at D127 [Ex. A].)  The patient must pay for the Zostavax immunization prior to the Pharmacist reconstituting the Zostavax dose.  (*Id.* at D128.)

27.     The Zostavax Presentation does *not* list in the contraindications (i.e., disqualifying factors) section a patient's negative history for chickenpox (varicella). (Pl.'s Dep. at 52 [Ex. A]; Def. Ex. 21, at D112 [Ex. A].)

28.     The ACIP's official VIS for Zostavax also does *not* list in the contraindications (i.e., disqualifying factors) section a patient's negative history for chickenpox (varicella). (Pl.'s Dep. at 134-135 [Ex. A]; Def. Ex. 16 [Ex. A].)

*Plaintiff's Failure to Complete the Zostavax*
*Training and Her Written Misrepresentation That She Had Completed the Training*

29.     Plaintiff "clicked through" each page of the Zostavax Presentation, but she admits that she did not read or absorb it as required: "I did not read it like I should. I did not absorb the information like I should." (Pl.'s Dep. at 105-106, 223-224 [Ex. A].)

30.     Plaintiff clicked through each page of the Zostavax presentation because she thought that Walgreens would be able to tell if she had not at least accessed each page: "And the last time when I had went [sic] through all the pages because I didn't think it would mark it's complete until I did that." (Pl.'s Dep. at 120-121 [Ex. A].)

31.     Nevertheless, Plaintiff signed the Training Acknowledgment Form on December 9, 2011, understanding at the time of her execution of the Training Acknowledgment Form that she was representing that she had completed the Zostavax training. (Pl.'s Dep. at 40-48, 121 [Ex. A].)

32.     Plaintiff knew it was wrong to sign the Training Acknowledgment Form despite not having read the Zostavax Presentation, but she still signed it. (Pl.'s Dep. at 81, 121 [Ex. A].)

33.     Plaintiff concedes that, as a Pharmacist, she should have read every single word of the Zostavax Presentation: "But with my job line, I should review or read specifically every single word." (Pl.'s Dep. at 81, 121 [Ex. A].)

34.     Plaintiff did not inform anyone at Walgreens that she had signed the Training Acknowledgment Form despite not having read the Zostavax Presentation. (Pl.'s Dep. at 85 [Ex. A].)

35.     Almost two weeks after Plaintiff signed the Training Acknowledgment Form (i.e., on December 22, 2011), the last Pharmacy staff member at the Store signed the Training Acknowledgment Form, and Ms. Patel faxed the fully executed Training Acknowledgment Form to the District Office. (Patel's Dep. at 62, 66-68 [Ex. B]; Patel's Decl., ¶¶4-5 [Ex. E]; Patel's Decl. Ex. 1 [Ex. E].)

*Plaintiff's Violations of Protocol Contained*
*in the Zostavax Presentation (That Plaintiff Had Not Read)*

36.     On April 4, 2012, an elderly patient came into the Store and explained to Plaintiff that she would like to receive the shingles vaccine because her friends were receiving it. (Pl.'s Dep. at 137-139 [Ex. A].)  Plaintiff had the elderly patient complete the VAR, she decided to give her the Zostavax dose, and she reconstituted the dose. (Pl.'s Dep. at 137-139 [Ex. A].)

37.     But Plaintiff then decided to not give the elderly patient the Zostavax dose based on information she had learned 11-12 years ago in school:

> Then I asked her if she has ever had chickenpox before, which is not an information -- which is not anywhere on [the VAR]. She said that she has never had chickenpox. I told her that she should not get it, she cannot have it because that would be almost -- that would be dangerous, maybe deadly for her at her age to get it. And I told her that I was, you know, not going to give it to her. She had already been billed for it, scanned. There was a receipt that was generated. We reversed it. And I told her that she should be fine; she should not get shingles if she never had chickenpox. And that was based off my knowledge from pharmacy school 11 years, 12 years before that.

(Pl.'s Dep. at 139-140 [Ex. A].)

38.     As noted above, the Zostavax Presentation and the ACIP's official VIS for Zostavax do not list among its contraindications a negative history for chickenpox (varicella). (Pl.'s Dep. at 52, 134-135 [Ex. A]; Def. Ex. 16 [Ex. A]; Def. Ex. 21, at D112 [Ex. A]).

39.     Thus, Plaintiff turned away an eligible patient who wanted to receive the Zostavax based on a contraindication that was not referenced in the Zostavax Presentation and that was not recognized by the ACIP.  (Pl.'s Dep. at 52, 139-140 [Ex. A]; Def. Ex. 21, at D112 [Ex. A].)

40.     Plaintiff violated the protocol set forth in the Zostavax Presentation in that she made a patient eligibility decision based on a contraindication not contained in the Zostavax Presentation (Zostavax Protocol Violation #1).  (Pl.'s Dep. at 52 [Ex. A]; Def. Ex. 21, at D112 [Ex. A].)

41.     Plaintiff also violated the protocol set forth in the Zostavax Presentation by reconstituting the dose (which must be used within 30 minutes or discarded) prior to making a final determination as to whether the elderly patient was eligible to receive the Zostavax (Zostavax Protocol Violation #2).  (Pl.'s Dep. at 52  [Ex. A]; Def. Ex. 21,  at D119 ["Prior to reconstituting the Zostavax dose . . . [r]eview the VAR to ensure the patient is eligible to receive the vaccine"] [Ex. A].)

42.     Plaintiff then offered the Zostavax dose to the Store Manager, Shanna Terek. (Pl.'s Dep. at 20, 150 [Ex. A].)

43.     Ms. Terek was 31 at the time, 19 years too young to be eligible to receive the Zostavax.  (Pl.'s Dep. at 52, 173 [Ex. A]; Def. Ex. 11 [Ex. A]; Def. Ex. 21, at D107, D107.1, D107.2, D107.3, D107.5, D107.6, D107.7 [Ex. A].)  Even if she had been 50 years old, she still

would not have been eligible to receive Zostavax unless she had a prescription for it (which she did not). (*Id.*)

44.     Contrary to the protocol set forth in the Zostavax Presentation, Plaintiff did not require Ms. Terek to complete a VAR before administering the Zostavax dose to her (Zostavax Protocol Violation #3). (Pl.'s Dep. at 52, 151 [Ex. A]; Def. Ex. 21, at D119 ["Prior to reconstituting the Zostavax dose . . . [r]eview the VAR to ensure the patient is eligible to receive the vaccine"], D128 [Ex. A].)

45.     Plaintiff testified at her deposition that she did not require Ms. Terek to complete a VAR prior to administering the Zostavax to her because (according to Plaintiff) she had administered an influenza vaccine to Ms. Terek a few months prior (at which time she had had her complete a VAR). (Pl.'s Dep. at 151-152 [Ex. A].) However, the VARs that were completed in connection with Ms. Terek's receipt of both influenza and pneumonia vaccines in the Fall of 2011 conclusively establish that Ms. Patel, not Plaintiff, had administered both of those vaccines to Ms. Terek. (Patel's Decl., ¶6 [Ex. E]; Patel's Decl. Ex. 2 [Ex. E].)

46.     In any event, the Zostavax Presentation does not state that a Pharmacist may rely on a VAR completed months prior to the date that the Zostavax is administered. (Pl.'s Dep. at 52, 151 [Ex. A]; Def. Ex. 21, at D119 ["Prior to reconstituting the Zostavax dose . . . [r]eview the VAR to ensure the patient is eligible to receive the vaccine"], D128 [Ex. A].)

47.     Plaintiff was responsible for verifying the patient, prescription, immunization, and insurance information entered into IntercomPlus (referred to at Walgreens as "data review") prior to administering the Zostavax to Ms. Terek. (Pl.'s Dep. at 52, 160-161, 237-238 [Ex. A]; Def. Ex. 21, at D127 [Ex. A].)

48.     Even though no Zostavax prescription existed, the prescribing physician listed in Ms. Terek's prescription profile in IntercomPlus (for reasons that remain unclear) was D. Jahovic, Ms. Terek's eye doctor.  (Pl.'s Dep. at 155, 172 [Ex. A]; Def. Ex. 12, at D095.1 [Ex. A].)

49.     Plaintiff understood at the time that an eye doctor would not have had any reason to prescribe a shingles vaccine, but she did not bother to look at the prescribing physician's name.  (Pl.'s Dep. at 160-163, 172 [Ex. A].)

50.     Moreover, the IntercomPlus screen that was supposed to contain an image/scan of the prescription stated, "Scanning Has Been Overridden – No Image Available."  (Pl.'s Dep. at 155 [Ex. A]; Def. Ex. 12, at D095.1 [Ex. A].)

51.     Plaintiff depressed the F4 key on the computer keyboard, thereby indicating that she had reviewed and verified the information entered into the prescription in IntercomPlus when, in fact, she had not even looked at the prescribing physician's name.  (Pl.'s Dep. at 160-163 [Ex. A].)  This action violated the protocol set forth in the Zostavax Presentation (Zostavax Protocol Violation #4).  (Pl.'s Dep. at 52 [Ex. A]; Def. Ex. 21, at D127 ["Pharmacist F4 to verify data entry"] [Ex. A].)

52.     By depressing the F4 key on the computer, an insurance claim containing false information (i.e., that Ms. Terek's eye doctor, Dr. Jahovic, had prescribed her Zostavax when, in fact, he had not) was electronically submitted to Ms. Terek's insurer.  (Pl.'s Dep. at 237-238 [Ex. A].)  This action violated the protocol set forth in the Zostavax Presentation (Zostavax Protocol Violation #5).  (Pl.'s Dep. at 52 [Ex. A]; Def. Ex. 21, at D127 ["Pharmacist F4 to verify data entry"] [Ex. A].)

53.     According to the Zostavax Presentation, Plaintiff also was required to allow the patient to review the VIS and ask any questions prior to administering the Zostavax dose. (Pl.'s Dep. at 52 [Ex. A]; Def. Ex. 21, at D119 ["Prior to reconstituting the Zostavax dose . . . [a]llow the patient to review the VIS and ask any questions"] [Ex. A].)

54.     There are two Zostavax VIS forms in the record, both of which expressly state that Zostavax is recommended for adults 60 years of age and older, and neither of which Plaintiff provided to Ms. Terek or discussed with her prior to injecting her with Zostavax. (Pl.'s Dep. at 130-135, 147-149, 154, 156, 165, 204-205 [Ex. A]; Def. Ex. 16 [Ex. A]; Def. Ex. 22 [Ex. A].)

55.     Plaintiff's failure to provide the VIS to Ms. Terek prior to injecting her with Zostavax violated the protocol set forth in the Zostavax presentation (Zostavax Protocol Violation #6). (Pl.'s Dep. at 52, 130-135, 147-149, 154, 156, 165, 204-205 [Ex. A]; Def. Ex. 16 [Ex. A]); Def. Ex. 21, at D119 ["Prior to reconstituting the Zostavax dose . . . [a]llow the patient to review the VIS and ask any questions"] [Ex. A]; Def. Ex. 22 [Ex. A].)

56.     Plaintiff then injected Ms. Terek with the Zostavax dose, which she was ineligible to receive both because of her age and because she lacked a patient-specific prescription. (Pl.'s Dep. at 52, 173 [Ex. A]; Def. Ex. 11 [Ex. A]; Def. Ex. 21, at D107, D107.1, D107.2, D107.3, D107.5, D107.6, D107.7 [Ex. A].)

57.     Plaintiff's injection of Ms. Terek with Zostavax violated the protocol set forth in the Zostavax Presentation (Zostavax Protocol Violation #7). (Pl.'s Dep. at 52, 173 [Ex. A]; Def. Ex. 11 [Ex. A]; Def. Ex. 21, at D107, D107.1, D107.2, D107.3, D107.5, D107.6, D107.7 [Ex. A].)

### Walgreens' Investigation of Plaintiff's Misconduct

58.     Ms. Patel was not working on April 4, 2012, when Plaintiff administered the Zostavax to Ms. Terek. (Pl.'s Dep. at 190 [Ex. A].) The next day (April 5), Ms. Patel learned

that Plaintiff had injected Ms. Terek with Zostavax from one of the Pharmacy Technicians. (Patel's Dep. at 83-84 [Ex. B].)

59.     Ms. Patel was concerned because Ms. Terek did not meet the age eligibility requirements to receive Zostavax, and she called Mr. Krynski at home to report that Plaintiff had injected Ms. Terek with Zostavax and that Ms. Terek was not eligible to receive the vaccine. (Patel's Dep. at 84-86 [Ex. B]; Krynski's Dep. at 173-175 [Ex. C].)

60.     In response, Mr. Krynski told Ms. Patel to contact Ms. Terek, Ms. Terek's physician, and the Immunization Department to advise them that Ms. Terek had received the Zostavax, and he asked Ms. Patel to complete a STAR report. (Krynski's Dep. at 173-177 [Ex. C].) STAR is a Walgreens computer database in which Walgreens Pharmacy staff enter prescription errors that have occurred and adverse events (i.e., adverse side effects) relating to a prescription. (Krynski's Dep. at 72-73 [Ex. C].)[3]

61.     On or about April 6, 2012, Mr. Krynski contacted Ms. Terek himself to ensure that she had been informed that she should not have received the Zostavax due to her age and to make sure that she made her physician aware of that fact. (Krynski's Dep. at 181-182 [Ex. C].)

62.     The following Monday, April 9, 2012, Mr. Krynski met with Mr. Al-Hamwi at the District Office to discuss various District-related issues. (Krynski's Dep. at 191-192 [Ex. C].)

63.     During the April 9, 2012 conversation, Mr. Al-Hamwi and Mr. Krynski discussed Plaintiff having administered the Zostavax to an ineligible patient. (Krynski's Dep. at 192-196

---

[3] The information contained in the STAR system is privileged and shielded from disclosure by the federal Patient Safety and Quality Improvement Act of 2005. *See, e.g., Dept. of Fin. And Prof. Reg. v. Walgreen Co.*, 970 N.E.2d 552 (Ill. App. Ct. 2012). Walgreens has mentioned the STAR system herein solely for background purposes, and nothing contained in Walgreens' submissions in this case is intended to waive, or should be construed as waiving, the protections afforded by the federal Patient Safety and Quality Improvement Act of 2005.

[Ex. C].) Mr. Al-Hamwi noted that it was similar to another immunization incident involving the dispensing of a vaccination without a prescription in violation of Company policy by a former employee named Gerald Bolde which had led to that employee's termination. (*Id.*)

64.    On April 27, 2012, Mr. Krynski and Larry Alders, the District Loss Prevention Manager, met with Plaintiff to investigate why Plaintiff had administered the Zostavax to Ms. Terek. (Pl.'s Dep. at 206-211 [Ex. A]; Def. Ex. 8 [Ex. A].)

65.    During the April 27, 2012 meeting, Plaintiff admitted to Mr. Krynski and Mr. Alders that she was not aware of the age or prescriptions requirements for Zostavax at the time she administered the dose to Ms. Terek, that "[she] didn't train – [she] didn't absorb the information" from the Zostavax Presentation, that "[she] just skimmed through quickly," and "that as a professional she should know better." (Pl.'s Dep. at 206-211 [Ex. A]; Def. Ex. 8, at D088 [Ex. A].)

66.    At the April 27, 2012 meeting, Plaintiff stated to Mr. Krynski and Mr. Alders that she had skimmed the Zostavax Presentation quickly because Ms. Patel had told her that "it was similar to another type of shot" and/or that it was "the same" or "basically the same as [the] immunization PowerPoint." (Pl.'s Dep. at 201-211 [Ex. A]; Def. Ex. 7 [Ex. A]; Def. Ex. 8, at D088 [Ex. A].) As Mr. Krynski testified at his deposition, whether Ms. Patel had made those statements to Plaintiff "wouldn't have mattered because [Plaintiff], being a licensed Pharmacist, she's responsible for completing the training that is expected to be completed." (Krynski's Dep. at 212 [Ex. C].)

67.    Although Plaintiff testified at her deposition that she had computer problems accessing and printing the Zostavax Presentation and that Ms. Patel had told her to sign the Training Acknowledgment Form even though she had not read the Zostavax Presentation, she

did not mention these excuses to Mr. Krynski or Mr. Alders during the April 27 meeting or at any other time. (Pl.'s Dep. at 201-211 [Ex. A]; Def. Ex. 7 [Ex. A]; Def. Ex. 8, at D088 [Ex. A].)

68.     Mr. Krynski also gave Plaintiff the opportunity to write a voluntary statement memorializing her version of the incident in her own words at the April 27 meeting (in which statement Plaintiff could have made a written record of any excuses that she cared to offer). (Pl.'s Dep. at 207 [Ex. A].)

69.     Plaintiff refused to write a statement memorializing her version of the incident in her own words at the April 27 meeting: "And I said this is voluntary. He said yes. I said l volunteer not to make this statement." (Pl.'s Dep. at 207 [Ex. A].)

70.     In her defense, Plaintiff complained to Mr. Krynski and Mr. Alders at the April 27 meeting that neither patient's chickenpox history nor the age limitation was referenced in the "the computer system" the VAR, or the VIS. (Pl.'s Dep. at 203.)

71.     As noted above, a patient's negative chickenpox history is not a contraindication for Zostavax, the Zostavax Presentation (containing six separate slides on the age criteria) was available at all times on the Company's intranet (StoreNet), the VAR (which Plaintiff did not require Ms. Terek to complete prior to immunizing her) requires the patient to provide his/her age and date of birth, and both VIS forms in the record expressly state that Zostavax is recommended for adults 60 years of age and older. (Pl.'s Dep. at 52, 55-56, 130-135, 149, 151, 154, 156, 165, 173, 204-205 [Ex. A]; Def. Ex. 11 [Ex. A]; Def. Ex. 16 [Ex. A]; Def. Ex. 21, at D107.1, D107.2, D107.3, D107.5, D107.6, D107.7, D112, D119, D128 [Ex. A].)

72.     Plaintiff never mentioned to Mr. Krynski that she felt that she had not had enough time to complete the Zostavax training, and she never mentioned to anyone at Walgreens that she had signed the Training Acknowledgment Form without reading the Zostavax Presentation prior

to admitting this misconduct during the April 27 meeting. (Pl.'s Dep. at 85-87, 100-108, 115-116, 201-211; Def. Ex. 7 [Ex. A]; Def. Ex. 8, at D088 [Ex. A].) Plaintiff also did not complain at any time to her Union, Mr. Al-Hamwi (with whom she had, in her words, "a good relationship"), Walgreens' Employee Relations, or the anonymous employee hotline regarding her belief that she had not been given enough time to complete her training. (*Id.*) Rather, two to three weeks prior to the April 27 meeting and months after signing the Training Acknowledgment Form, Plaintiff merely informed Mr. Krynski that felt that she did not have enough time to complete her training the way it should be completed (without referencing the Zostavax training), in response to which Mr. Krynski suggested she complete her training during the two-hour Pharmacist overlap mentioned above or during downtime. (*Id.*)

*Mr. Krynski's Decision to Terminate Plaintiff's*
*Employment and Mr. Al-Hamwi's Refusal to Reverse the Decision*

73.    Walgreens' Discipline Policy states, in pertinent part:

> [S]erious misconduct may justify immediate dismissal. Actions which justify immediate dismissal include, but are not limited to, the following:
>
> . . . .
>
> Dishonesty
>
> . . . .
>
> Gross misconduct or negligence

(Krynski's Dep. at 44-45, 56 [Ex. C]; Krynski Ex. 5 [Ex. C].)

74.    Whether a Pharmacist's or Pharmacy Manager's prescription error(s) justify discipline under the Discipline Policy, as well as the form of discipline to be meted out under the Discipline Policy, depend on the factors that led to the error(s) occurring. (Krynski's Dep. at 55-58, 134-135, 137-138, 210-213, 216-217 [Ex. C].)

75.     Mr. Krynski explained at his deposition that he made the decision to terminate

Plaintiff's employment based on his belief that Plaintiff's deliberate actions rose to the level of

dishonesty and gross misconduct:

> Because [Plaintiff] *deliberately did not complete the Zostavax*
> *training. She did not – she signed off that she did complete it. She*
> *did not complete a VAR Form with a patient and go over that with*
> *the individual prior to giving the vaccination. These deliberate*
> *actions* led to other errors that resulted in her still providing a
> vaccination to somebody that is not eligible to receive it, so that
> led to an error that the prescription was entered and didn't follow
> protocol, which it wouldn't have been eligible anyway, didn't have
> a prescription from a physician, it was entered under a physician's
> name that wouldn't have prescribed the – wouldn't have been
> eligible to write the prescription anyway, and we ended up billing
> an insurance for the vaccination.
>
> So pretty much the *deliberate actions of gross misconduct, you*
> *know, not completing the training, signing off that she completed it*
> *which was being dishonest are definitely key factors*.

(Krynski's Dep. at 210-11 [Ex. C] [emphasis added].)

76.     At the end of the April 27 meeting, Mr. Krynski advised Plaintiff of his decision

to terminate her employment.  (Pl.'s Dep. at 207-08 [Ex. A].)

77.     When asked by Plaintiff's counsel why other Pharmacists received forms of

discipline short of discharge despite making numerous mistakes in dispensing prescriptions,

Mr. Krynski explained the difference between Plaintiff's deliberate misconduct and the other

Pharmacists' mere negligence:

> There is the *deliberate actions* [Plaintiff] took, again, avoiding
> completing the training and not absorbing the material and signing
> off that she did complete the training, not completing the VAR
> Form with the patient and going over that prior to administration,
> *those deliberate actions* by her led to other areas of negligence of
> verifying a prescription that we didn't have a prescription for,
> having it under a doctor that wouldn't have been able to prescribe
> it in the first place and billing an insurance, all that was verified by
> her in that verification process of the immunization.

Where the other ones [the Pharmacists who were not discharged] that went to the step approach quality process were *mere negligence* on their part and *it wasn't due to any specific training that they failed to complete or signed off on that they did do it.* That was their interpretations of directions or possibly whatever data entry they viewed at that time.

(Krynski's Dep. at 212-13 [Ex. C] [emphasis added].)

78.     After being advised by Mr. Krynski that her employment was terminated, Plaintiff

insisted on a meeting with Mr. Al-Hamwi without Mr. Krynski present, which Mr. Krynski

arranged.  (Pl.'s Dep. at 206-208 [Ex. A]; Def. Ex. 8 [Ex. A].)

79.     On April 30, Mr. Al-Hamwi met with Plaintiff and advised her that the

termination decision would stand.  (Pl.'s Dep. at 209-210 [Ex. A]; Def. Ex. 8 [Ex. A].)

Date:   July 19, 2013                          Respectfully submitted,


                                                /s/ William J. Wortel
                                               One of the Attorneys for Defendant,
                                               Walgreen Co.


William J. Wortel
Jackie V. Iannicelli
BRYAN CAVE LLP
161 N. Clark Street
Suite 4300
Chicago, Illinois 60601
(312) 602-5000 (telephone)
(312) 602-5050 (facsimile)
Email: bill.wortel@bryancave.com
        jackie.iannicelli@bryancave.com

## CERTIFICATE OF SERVICE

I, William J. Wortel, an attorney, certify that I caused a copy of the foregoing *Defendant's Local Rule 56.1(a)(3) Statement of Material Facts as to Which There is No Genuine Issue* to be served upon the following individuals via the Court's electronic filing system, on this 19th day of July, 2013:

> John S. Bishof, Jr.
> Zahra Sagha
> Patricia N. Gerberich
> Law Office of John S. Bishof, P.C.
> 77 West Washington Street
> Suite 1910
> Chicago, IL 60602
> jsbishof@jsblegal.com
> zsagha@qmail.com
> patricia.gerberich@gmail.com

> /s/ William J. Wortel
> William J. Wortel

235836.8