## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MARYAM ALRAZZAQ, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case no. 12-cv-7560** |
| **v.** | ) | |
| | ) | **Hon. John Z. Lee** |
| WALGREEN CO. d/b/a WALGREEN | ) | |
| PHARMACY SERVICES EASTERN, | ) | |
| | ) | |
| **Defendant.** | | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Maryam Alrazzaq ("Alrazzaq"), a former Pharmacist employed by Defendant Walgreen Co. ("Walgreen"), is a Muslim woman who was pregnant when Walgreen terminated her employment. Alrazzaq brings suit pursuant to 42 U.S.C. § 2000e-2(a)(2) ("Title VII"), alleging that she was discriminated against based upon her national origin (Count I), gender (Count II), and religion (Count III). Walgreen has moved for summary judgment as to all of Alrazzaq's claims, arguing that it properly terminated her for what it deems "gross misconduct." For the reasons set forth below, Walgreen's motion for summary judgment is granted in part and denied in part.

## Local Rule 56.1

Motions for summary judgment in the Northern District of Illinois are governed by Local Rule 56.1. "The obligation set forth in Local Rule 56.1 'is not a mere formality.' Rather, '[i]t follows from the obligation imposed by Fed. R. Civ. P. 56(e) on the party opposing summary judgment to identify specific facts that establish a genuine issue for trial.'" *Delapaz v. Richardson,* 634 F.3d 895, 899 (7th Cir. 2011) (citation omitted) (quoting *Waldridge v. Am.*

*Hoechst Corp.,* 24 F.3d 918, 924 (7th Cir. 1994)). The Seventh Circuit has "routinely held that a district court may strictly enforce compliance with its local rules regarding summary judgment motions." *Yancick v. Hanna Steel Corp.,* 653 F.3d 532, 537 (7th Cir. 2011) (quotation omitted).

Local Rule 56.1(b)(3)(B) requires the nonmovant to file a "concise response to the movant's statement that shall contain . . . a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." *See* Local Rule 56.1(b)(3)(B). Local Rule 56.1(b)(3)(C) also "requires specifically that a litigant seeking to oppose a motion for summary judgment file a response that contains a separate 'statement . . . of any additional facts that require the denial of summary judgment.'" *Cichon v. Exelon Generation Co., L.L.C.,* 401 F.3d 803, 809 (7th Cir. 2005) (quoting Local Rule 56.1).

The failure of a nonmoving party to abide by the rule's requirements carries significant consequences. "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." Local Rule 56.1(b)(3); *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003) ("We have consistently held that a failure to respond by the nonmovant as mandated by the local rules results in an admission."). "This rule may be the most important litigation rule outside statutes of limitation because the consequences of failing to satisfy its requirements are so dire." *Malec v. Sanford,* 191 F.R.D. 581, 584 (N.D. Ill. 2000).

Here, Walgreen argues that Alrazzaq fails to comply with Local Rule 56.1 in numerous respects, including, most notably, not properly supporting her denials of Walgreen's statements of fact with appropriate evidence. The Court agrees in certain instances. The Court also notes, however, that its holding below is not contingent on many of the "disputed" facts. As a result,

the Court declines to strike most of Alrazzaq's Local Rule 56.1(b)(3)(C) statement as Walgreen requests, except as noted below.

**Factual Background**

Alrazzaq is a licensed Pharmacist and Pharmacy Technician with a Doctorate in Pharmacy. (Def.'s Local Rule 56.1(a)(3) Stmt. ¶ 3.) In January 2001, Walgreen hired Alrazzaq as a Pharmacy Intern, and she worked in that position until she obtained her Pharmacy license later that year and became a Staff Pharmacist. (*Id.* ¶ 4.) Until late April 2012, Alrazzaq was a Staff Pharmacist at the Hometown, Illinois store. (*Id.* ¶¶ 4, 6.) From December 2010 until her termination in late Apri1 2012, Alrazzaq reported to Binita Patel ("Patel"), the store's Pharmacy Manager. (*Id.* ¶ 7.) During that time, Alrazzaq reported indirectly to Paul Krynski ("Krynski"), the Pharmacy Supervisor for the Hometown store and approximately twenty-five other Walgreen stores. (*Id.*) In turn, Krynski reported to the District Manager, Anas Al-Hamwi ("Al-Hamwi"). (*Id.*)

A.      **Walgreen's Policies and Procedures**

As a Staff Pharmacist at Walgreen, Alrazzaq had numerous required job responsibilities and required skills, which included the following:

JOB RESPONSIBILITIES/TASKS:

1.      Reviews and verifies prescriptions to include fully utilizing pharmacy systems, ensuring information is entered correctly, verifying medicine is correct . . . .

. . . .

8.      Ensures the proper processing of insurance claims . . . .

9.      Adheres to government laws and regulations, corporate policies and procedures, ethics and codes of conduct.

. . . .

11.     Provides immunizations . . . .

                . . . .

14.     Maintains knowledge and skill in the fields of pharmacy
        and healthcare, reads pharmacy related journals, reads
        company publications and communications, completes
        People Plus Learning modules, and continuing education
        credits, researches new drugs, attends district meetings, etc.

15.     Obtains necessary certifications and completes other
        training required by the company.

                . . . .

20.     Assists Pharmacy Manager in training employees,
        including new hire orientation, on-the-job training, cross
        training, answering questions, determining training needs,
        following up to ensure training is used, and coaching
        informally.

                . . . .

KNOWLEDGE, SKILLS and ABILITIES: (* denotes not required at entry to the job)

    •     Knowledge of state and federal pharmacy laws and
          regulations for taking and dispensing prescriptions.

    •     * Knowledge of pharmacy products, services, and
          operations.

                . . . .

    •     Multitasking and time management skills to handle
          multiple tasks at once and work in a pharmacy.

    •     Judgment and decision making skills to make decisions on
          drugs, interactions, customer service, inventory, etc.

                . . . .

    •     Ability to learn, retain, and apply new information.

    •     Ethics to behave appropriately and morally in dispensing
          prescriptions and in the treatment of others.

(*Id.* ¶ 5.)

As part of its quality control efforts, Walgreen requires its Pharmacists to complete various job-specific training modules. (*Id.* ¶ 10.) Pharmacists can access Walgreen policies and protocols through its intranet system, called "StoreNet." (*Id.* ¶ 11.) Employees may use a computer program called "People Plus Learning" (also known as "PPL") to complete training modules, often by viewing Microsoft PowerPoint presentations. (*Id.* ¶¶ 12, 13.) PPL allows Walgreen to track electronically which modules have been completed by which employees. (*Id.*) There are computers available in the Hometown Walgreen's store for employees to access StoreNet and complete the training modules, and they may also print training materials to review in hard-copy format. (*Id.* ¶¶ 14-15.) Walgreen provides a two-hour overlap on weekdays for the two Pharmacists on duty to take a break for meals or perform other duties outside of the Pharmacy Department. (*Id.* ¶¶ 16-17.) If the Pharmacy is not busy, Pharmacy staff may also use that time to complete required training. (*Id.* ¶ 18.) Alrazzaq completed almost 200 PPL training modules at various times throughout her career at Walgreen. (*Id.* ¶ 19.)

**B.      Zostavax Training and Immunizations**

In or around early November 2011, Alrazzaq became aware that Walgreen had uploaded to StoreNet a PowerPoint training presentation regarding Zostavax (the "Zostavax Presentation"), a new shingles vaccine. (*Id.* ¶ 20.) Later that month, Patel asked Alrazzaq to "complete the training" for Zostavax, and asked her to sign and date a "Training Acknowledgement Form" located on the Pharmacy counter once she had completed the training. (*Id.* ¶ 21.)

The Zostavax Presentation stated, in relevant part, that Pharmacists may only administer Zostavax to patients over age 50, and, if the patients are between 50-59, only with a prescription.

(*Id.* ¶ 23.)  The Zostavax Presentation also specified that the prospective patient had to complete a Vaccine Administration Record ("VAR") prior to receiving the vaccine so the Pharmacist could determine the patient's eligibility.  (*Id.* ¶ 24.)  The VAR, among other things, required the patient to list his/her date of birth and age.  (*Id.*)  The Zostavax Presentation further specified that prior to reconstituting (*i.e.*, mixing and preparing for injection) the Zostavax dose, the Pharmacist must review the VAR to determine the patient's eligibility.  (*Id.*)  The Zostavax Presentation also instructed the administering Pharmacist to allow the patient to review the Vaccine Information Statement ("VIS"), which discloses certain information about the vaccine, and to take payment for the vaccine prior to administering it to a patient.  (*Id.* ¶¶ 25-26.) Importantly for the purposes of this motion, neither the Zostavax Presentation nor the VIS state that a patient's negative history for chickenpox is a disqualifying factor for receiving the vaccine. (*Id.* ¶¶ 27-28.)

Alrazzaq admitted at her deposition that while she "clicked through" each page of the Zostavax Presentation, she "did not read it like I should.  I did not absorb the information like I should."  (*Id.* ¶ 29.)  Moreover, Alrazzaq acknowledged that although she had not thoroughly read the Zostavax Presentation, "with my job line, I should review or read specifically every single word."  (*Id.* ¶ 33.)  Alrazzaq nevertheless signed the Training Acknowledgement Form, which, she admits, indicated to Walgreen that she had finished training.  (*Id.* ¶ 31.)  On December 22, 2011, Patel faxed the executed Training Acknowledgement Form to the Walgreen District Office.  (*Id.* ¶ 35.)

On April 4, 2012, an elderly patient entered the Hometown Walgreen store and informed Alrazzaq that she wanted to receive the shingles vaccine.  (*Id.* ¶ 36.)  Alrazzaq had her complete the VAR and reconstituted the dose.  (*Id.*)  However, before administering the dose, Alrazzaq

asked the patient whether she had ever had chickenpox, and the patient replied that she had not. (*Id.* ¶ 37.) Alrazzaq then advised the patient that she would not administer the vaccine because it would be dangerous for the patient having not had chickenpox. (*Id.*) The VAR, however, does not ask whether a patient has ever had chickenpox, and, as Alrazzaq later acknowledged, nor was it a factor listed to determine eligibility in the Zostavax Presentation. (*Id.* ¶¶ 37, 40.) Instead, Alrazzaq asked the question "based off [her] knowledge from pharmacy school 11 years, 12 years before that." (*Id.*)

Although Alrazzaq turned away the patient, she had already reconstituted the Zostavax dose, and so, for some reason not elucidated by either party, she offered to administer it to the thirty-one-year-old Store Manager. (*Id.* ¶¶ 42-43.) The Store Manager did not have a prescription for the vaccine, and, in any event, was too young to receive Zostavax. (*Id.* ¶ 43.) However, Alrazzaq claims that Patel, her supervisor, had told her that the protocol for administering Zostavax was the same as that for the flu vaccine, which she had previously administered to the Store Manager. (Pl.'s Resp. Def.'s LR 56.1(a)(3) ¶¶ 43, 45.) Alrazzaq also did not require the Store Manager to complete a VAR before administering the Zostavax dose to her, which, she again claims, she did not do because the Store Manager previously completed one for the flu vaccine.[1] (Def.'s LR 56.1(a)(3) ¶¶ 44-45.) But the Zostavax Presentation did not state that a Pharmacist may rely upon a VAR for a different drug that was completed prior to the date that the Zostavax was administered. (*Id.* ¶ 46.)

Moreover, Alrazzaq, as the administering Pharmacist, was responsible for verifying the patient, prescription, immunization, and insurance information entered into the Walgreen computer system (a task referred to at Walgreens as "data review"). (*Id.* ¶ 47.) Although the

---

[1] Alrazzaq fails to admit or deny these propositions, and thus, they are deemed admitted for the purposes of this motion. Local Rule 56.1(b)(3).

Store Manager had no Zostavax prescription, her prescription profile in in the Walgreen database lists her eye doctor as the prescribing physician for the Zostavax vaccine (for reasons that remain unclear). (*Id.* ¶ 48.) Regardless of whether Alrazzaq entered incorrect information knowingly or unknowingly, or simply failed to verify the accuracy of information already in the database, Alrazzaq acknowledged that she had made a mistake in not verifying the prescriber. (Pl.'s Resp. Def.'s LR 56.1(a)(3) ¶ 49.) Alrazzaq admits that she injected the Store Manager with the Zostavax dose, and she also admits that the Store Manager was ineligible to receive it both because of the Store Manager's age and because she lacked a patient-specific prescription. (*Id.* ¶ 56.)

### C.    Walgreen Investigates and Terminates Alrazzaq

Patel was not at work the day that Alrazzaq administered the Zostavax to the Store Manager but learned that Alrazzaq had done so the following day from one of the Pharmacy Technicians. (*Id.* ¶ 58.) Patel reported the incident to Krynski, who instructed her to contact the Store Manager's physician and the Immunization Department to advise them that the Store Manager had received the Zostavax. (*Id.* ¶¶ 59-60.) Krynski also directed Patel to complete a STAR report, which is an internal computer database entry memorializing prescription errors and adverse effects on patients who have taken a certain prescription. (*Id.*) Krynski contacted the Store Manager to confirm that she had been informed that she should not have been given the Zostavax due to her age and that her physician had been notified. (*Id.* ¶ 61.)

A few days later, on April 9, 2012, Krynski met with Al-Hamwi to discuss various District-related issues, including that Alrazzaq had administered the Zostavax to the underage Store Manager. (*Id.* ¶¶ 62-63.) Krynski testified that at that meeting, he and Al-Hamwi discussed an earlier incident in which another pharmacist had been terminated for dispensing a

vaccination without a prescription.  (*Id.* ¶ 63.)  On April 27, 2012, Krynski and Larry Alders, the District Loss Prevention Manager, met with Alrazzaq to investigate why she had given the Zostavax to the Store Manager.  (*Id.* ¶ 64.)

During the April 27, 2012, meeting, Alrazzaq admitted that she did not fully understand the eligibility requirements for administering Zostavax, and that she had not sufficiently reviewed the Zostavax Presentation.  (*Id.* ¶ 65.)  Alrazzaq claimed that she had skimmed the Zostavax Presentation because Patel had told her that Zostavax "was similar to another type of shot" and/or that the Zostavax Presentation was "basically the same" as another immunization PowerPoint.  (*Id.* ¶ 66.)  At either the April 27, 2012, meeting or at any other time, Alrazzaq made no mention of any computer problems accessing the Zostavax Presentation nor that Patel had told her to sign the Training Acknowledgement Form without finishing the Zostavax Presentation.[2]  (*Id.* ¶ 67.)

At the April 27 meeting, Krynski offered Alrazzaq the opportunity to write a voluntary statement regarding the incident, but she declined to do so.  (*Id.* ¶¶ 68-69.)  Krynski then advised Alrazzaq that he was terminating her employment.  (*Id.* ¶ 76.)  On April 30, 2012, Al-Hamwi affirmed Krynski's termination decision.  (*Id.* ¶ 79.)

### D. Walgreen's Disciplinary Policies

The Walgreen Pharmacy Department has two disciplinary systems:  a Progressive Discipline Policy, which applies to all Walgreen employees; and the Step Approach for Quality Improvement (Step Approach), which applies only to Pharmacists.  (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 16.)  Walgreen's Progressive Discipline Policy states, in part, that "serious misconduct may

---

[2] Although Alrazzaq claimed that neither the patient's chickenpox history nor the age limitation was referenced in "the computer system," the VAR, or the VIS, Walgreen disputes that contention, establishing that the VAR requires the patient to state his or her age and date of birth, the VIS forms indicate that Zostavax is recommended for adults 60 years of age or older, and the Zostavax Presentation contains six separate slides regarding age criteria.  (*Id.* ¶¶ 70-71.)

justify immediate dismissal. Actions which justify immediate dismissal include, but are not limited to . . . Dishonesty . . . Gross misconduct or negligence." (Def.'s LR 56.1(a)(3) Stmt. ¶ 73.) The determination of whether a Pharmacist's errors justify discipline under the Walgreen Discipline Policy, and which disciplinary system will apply, turns on the facts of each situation. (*Id.* ¶ 74; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 17.) Krynski had the authority to make this determination. (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 17.)

The Step Approach disciplinary policy is applied to Pharmacists who "continue[] to struggle with quality despite repeated quality interventions." (*Id.* ¶ 18.) There are four progressive steps: verbal, written, final written, and termination. (*Id.* ¶ 21.) However, as appropriate, any of the Steps in the policy may be accelerated at the discretion of the district supervisor. (Def.'s Resp. to Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 19.) Krynski testified that the Step Approach process would apply to prescription errors, such as dispensing an incorrect drug, incorrect dosage, incorrect instructions, failing to issue correct directions, or failing to confirm a patient's identification prior to dispensing a drug. (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 20.)

Generally, a Pharmacist will have to commit six prescription errors within a three-month time period to be placed into the Step Approach program. (*Id.* ¶ 23.) The first step, Verbal Counseling, means that the Pharmacist's District Supervisor will conduct and document a Quality Awareness Conversation with the Pharmacist. (*Id.* ¶¶ 19, 23.) The second and third step involve the issuance of written warnings, and, when a participant reaches the third step, the supervisor will issue a Final Written Warning Form, which lists the types of errors committed by the employee, including as applicable: Data Review, Product Review, Incorrect Package to Patient, Immunization, and Failure to report an event. (*Id.* ¶ 22.) An employee is considered no

longer a part of the Step Approach program if one year passes without a disciplinary step being instituted or recommended. (*Id.* ¶ 24.)

Alrazzaq was never placed into the Step Approach program or disciplined in any other manner prior to her termination. (*Id.* ¶ 27.) One week before she was fired, however, Alrazzaq advised Krynski that she was pregnant, and due to some issues dealing with her pregnancy, she was not willing to work nine-hour shifts. (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 1.) Krynski instructed her that she had to work nine-hour shifts and if she did not like it she had to take the day off. (*Id.*) Additionally, on another, unspecified occasion, Alrazzaq asked Krynski whether she could take her break in the evening after fasting all day during Ramadan when she was working the 2:00 p.m. to 10:00 p.m. shift. (*Id.* ¶ 2.) Krynski advised Alrazzaq that if the Pharmacy was not busy and did not have patients she could take her break in the evening. (*Id.*)

Krynski testified that he ultimately decided to terminate Alrazzaq because she "deliberately did not complete the Zostavax training. She did not – she signed off that she did complete it. She did not complete a VAR Form with a patient and go over that with the individual prior to giving the vaccination. These deliberate actions led to other errors that resulted in her still providing a vaccination to somebody that is not eligible to receive it . . . . So pretty much the deliberate actions of gross misconduct . . . not completing the training, signing off that she completed it which was being dishonest are definitely key factors."[3] (Def.'s LR 56.1(a)(3) Stmt. ¶ 75.) At his deposition, Krynski further testified that it did not matter what Patel had told Alrazzaq, because Alrazzaq was "a licensed Pharmacist" and was therefore

---

[3] Alrazzaq objects to the factual assertions set forth in paragraph 75 of Walgreen's LR 56.1(a)(3) Statement; however, Alrazzaq's denials fail to comport with Local Rule 56.1 and are therefore stricken. Alrazzaq focuses her denial solely on setting forth facts that she believes contradicts Krynski's testimony. But Alrazzaq fails to dispute that Krynski did in fact testify as stated, and those facts are deemed admitted for the purposes of this motion.

"responsible for completing the training that is expected to be completed." (*Id.* ¶ 66.) Alrazzaq's counsel also asked Krynski why he had terminated Alrazzaq when he had placed other Pharmacists who made errors in dispensing prescriptions in the Step Approach disciplinary program. (*Id.* ¶ 77.) Krynski responded that in his view, Alrazzaq took "deliberate actions" that "led to other areas of negligence," whereas the other Pharmacists demonstrated "mere negligence on their part and it wasn't due to any specific training that they failed to complete or signed off on that they did do it."[4] (*Id.*)

### E. Disciplinary Actions Against Other Walgreen Pharmacy Employees

In connection with this litigation, Walgreen produced the records of forty Pharmacists and Pharmacy Managers who were placed in the Step Approach program. (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 32.)

J.G.,[5] a male Pharmacist, was placed in the Step Approach program. (*Id.* ¶ 33.) On December 28, 2009, J.G. received verbal counseling, and on April 23, 2010, he received a written warning. (*Id.*) J.G. committed prescription errors of data review and product review. (*Id.*) On October 25, 2010, J.G. was placed in the Final Written Review Step for prescription errors involving data review and product review. (*Id.*)

O.B., a male Pharmacist, was placed in the Step Approach program. (*Id.* ¶ 34.) On May 20, 2010, O.B. took part in a Pre Step One quality awareness conversation. (*Id.*) On August 23, 2010, O.B. received verbal counseling, and on March 27, 2011, he received a written warning.

---

[4] Again, Alrazzaq objects to the factual assertions set forth in paragraph 77 of Walgreen's LR 56.1(a)(3) Statement; however, Alrazzaq's denials fail to comport with Local Rule 56.1 and are therefore stricken. Alrazzaq focuses her denial solely on what she deems the truthfulness of Krynski's testimony. But Alrazzaq fails to dispute that Krynski did in fact testify as stated, and the fact that he testified as stated is deemed admitted for the purposes of this motion.

[5] Walgreen sought leave, which was granted by the Court, to redact the names of the proposed comparators from the record in order to protect their privacy. (Dkt. 34.) The Court therefore refers to them only by their initials.

(*Id.*) The written warning indicated that he should open a bottle to view its contents, which could indicate that he dispensed a wrong drug or in the wrong strength. (*Id.*)

E.G., a male Pharmacy Manager, was placed in the Step Approach program. (*Id.* ¶ 35.) On September 21, 2010, E.G. took part in a Pre Step One quality awareness conversation. (*Id.*) On February 18, 2011, he received verbal counseling. (*Id.*) Records indicate that E.G. was directed to look at the prescription before looking at what the Pharmacy Technician entered and to verify the prescription, and also that he dispensed the wrong bottle and bag. (*Id.*)

J.K., a female Pharmacist, was placed in the Step Approach program. (*Id.* ¶ 36.) On December 21, 2010, she took part in a Pre Step One quality awareness conversation. (*Id.*) On April 6, 2012, she received verbal counseling, and on September 15, 2012, she received a written warning. (*Id.*) J.K. was directed to check the prescription before looking at what the Pharmacy Technician entered and to verify the prescription, and to focus on reducing medication errors. (*Id.*)

C.S., a male Pharmacist, was placed in the Step Approach program. (*Id.* ¶ 37.) On April 14, 2011, he took part in a Pre Step One quality awareness conversation. (*Id.*) On February 18, 2011, C.S. received verbal counseling. (*Id.*) C.S. was counseled to look at the prescription before looking at what the Pharmacy Technician entered and to verify the prescription. (*Id.*)

K.O., a male Pharmacist, was placed in the Step Approach program. (*Id.* ¶ 38.) On February 10, 2010, he took part in a Pre Step One quality awareness conversation. (*Id.*) On June 23, 2010, he received verbal counseling, and on September 23, 2010, he received a written warning. (*Id.*) K.O. was assigned to a training program to reduce prescription medication errors. (*Id.*)

B.P., a female Pharmacy Manager, was placed in the Step Approach program. (*Id.* ¶ 39.) On May 20, 2011 and June 6, 2012, B.P. had Step One verbal counseling sessions. (*Id.*) Krynski does not recall the basis for B.P.'s disciplinary proceedings. (*Id.*)

## Discussion

Summary judgment is proper for cases in which "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has sufficiently demonstrated the absence of a genuine issue of material fact, the nonmovant must then set forth specific facts demonstrating that there are disputed material facts that must be decided at trial. *Id.* at 321-22.

Title VII precludes employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1). A Title VII plaintiff seeking to defeat a summary judgment motion must present either (1) direct or circumstantial evidence of discrimination (the "direct method") or (2) indirect evidence that establishes a *prima facie* case and satisfies the burden-shifting approach set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801–02 (1973) (the "indirect method"). *See Caskey v. Colgate–Palmolive Co.,* 535 F.3d 585, 591–92 (7th Cir. 2008). Here, Alrazzaq concedes that she lacks direct evidence of discrimination, but argues that she nevertheless can provide sufficient circumstantial evidence of discrimination to survive summary judgment via the direct method.

In order to meet her burden under the direct method, Alrazzaq must present a "'convincing mosaic of circumstantial evidence . . . that point[s] directly to a discriminatory reason for the employer's action.'" *Dass v. Chi. Bd. of Educ.*, 675 F.3d 1060, 1071 (7th Cir.

2012) (quoting *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 783 (7th Cir. 2004)).  Moreover, the circumstantial evidence must be "'directly related to the employment decision.'"  *Id.* (quoting *Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 602 (7th Cir. 2003)).  In the Seventh Circuit, there are three categories of circumstantial evidence that will allow a plaintiff to satisfy this burden.  "One includes 'suspicious timing, ambiguous statements oral or written, . . . and other bits and pieces from which an inference of [retaliatory] intent might be drawn.'"  *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012) (internal citations and quotations omitted).  "Another is 'evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently.'"  *Id.* (internal citations and quotations omitted.)  "Another type is 'evidence that the employer offered a pretextual reason for an adverse employment action.'"  *Id.* (internal citations and quotations omitted.)  "'Each type of evidence is sufficient by itself (depending of course on its strength in relation to whatever other evidence is in the case) to support a judgment for the plaintiff; or they can be used together.'"  *Id.* (internal citations and quotations omitted.)  In order to defeat summary judgment via the direct method, Alrazzaq therefore must provide some evidence from at least one of these categories that supports her claims.

The Court notes that Alrazzaq's response brief is unclear as to whether she also wishes to proceed under the indirect method of proof, given that she makes reference to establishing a "*prima facie* case of discrimination."  (Resp. Br. 13.)  Under the indirect method, a plaintiff seeking to defeat summary judgment establishes a *prima facie* case of discrimination by demonstrating that "[s]he belongs to a protected class, was meeting the employer's legitimate expectations, suffered an adverse action, and was treated worse than similarly situated employees outside the protected class." *Lewis v. Caterpillar Inc.,* 367 Fed. Appx. 683, 685 (7th Cir. 2010).

If a plaintiff establishes a *prima facie* case under the foregoing standards, the burden shifts to the defendant to "provide a legitimate nondiscriminatory reason for the action." *Fleishman v. Cont'l Cas. Co.,* 698 F.3d 598, 609 (7th Cir. 2012). Once the defendant does so, to the extent it can, the burden shifts back to the plaintiff to establish that the defendant's reason for termination was pretextual, either "directly," by presenting evidence that the employer "was more likely than not motivated by a discriminatory reason, or indirectly by evidence that the employer's explanation is not credible." *Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1039 (7th Cir. 1993) (citations omitted).

The direct method and indirect method of proof intersect in a number of ways. For example, where a plaintiff can show the existence of similarly situated comparators who did not experience a similar adverse employment action, such evidence can both serve as circumstantial evidence of discrimination under the direct approach and satisfy one of the *prima facie* elements under the indirect approach. *See Chaib v. Indiana*, --- F.3d ---, No. 13-1680, 2014 WL 685274, at *4 (7th Cir. Feb. 24, 2014); *Coleman*, 667 F.3d at 841 (valid comparator evidence may be used to "demonstrate pretext"). Accordingly, a plaintiff's failure to provide evidence of relevant comparators curtails a plaintiff's ability to rely upon the direct approach (particularly where the record is devoid of any other discriminatory evidence) and dooms his efforts to use the indirect approach. Often, evidence related to pretext also arises under both methods. For example, circumstantial evidence from which a reasonable jury can find that an employer's purportedly legitimate reason for the adverse employment action was pretext could constitute circumstantial evidence of discriminatory animus. *Van Antwerp v. City of Peoria*, 627 F.3d 295, 298 (7th Cir. 2010). At the same time, under the indirect approach, once a plaintiff establishes a *prima facie* case and the employer offers a purportedly nondiscriminatory reason for the adverse employment

action, a plaintiff can then rely upon similar facts to show that the stated reason was pretext. *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014).

Recently, Chief Judge Diane P. Wood of the U.S. Court of Appeals for the Seventh Circuit in a concurring opinion, which (rather unusually) was joined by the other two judges of the three-judge panel, discussed the knotted relationship between the direct and indirect methods of proof in discrimination cases, noting "it seems to me that the time has come to collapse all these tests into one." *Coleman*, 667 F. 3d at 863 (Wood, C.J., concurring). The Seventh Circuit has not gone so far as to make this the rule yet, but the facts and issues in this case lend themselves to a discussion focused primarily upon Alrazzaq's attempts to establish the existence of relevant comparators and pretext. The other elements of the direct and indirect methods will be addressed when necessary.

I.      **Religion and National Origin**

The Court first addresses Alrazzaq's claims of discrimination due to her religion and national origin.

A.      **Similarly-Situated Employees**

Alrazzaq argues that similarly-situated employees outside of her protected class received systematically better treatment. *Dass*, 675 F.3d at 1071; *see also Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 393 (7th Cir. 2010). A plaintiff seeking to establish that a person is a valid comparator for the purposes of this analysis must demonstrate that "'the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Weber v. Univs. Research Ass'n, Inc.,* 621 F.3d 589, 594 (7th Cir. 2010) (internal citations omitted) (emphasis omitted). Individuals are

considered to share the "same supervisor" where the comparator was treated more favorably by the same decision-maker who took an adverse employment action against the plaintiff. *Ellis v. United Parcel Serv.,* 523 F.3d 823, 826 (7th Cir. 2008). To determine whether the "same standards of conduct" are present, courts examine "'whether the employer subjected [the plaintiff and the comparator] to different employment policies.'" *Coleman,* 667 F.3d at 848–49 (internal quotations and citations omitted).

As *Coleman* held, in a case such as this one involving "disparate discipline . . . the similarly-situated inquiry often hinges on whether co-workers 'engaged in comparable rule or policy violations' and received more lenient discipline." *Id.* at 850 (internal quotations and citations omitted). However, "'precise equivalence in culpability between employees is not the ultimate question.'" *Id.* (quoting *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n.11 (1976)). Allegations that the comparator employees committed acts of "comparable seriousness," but were treated more favorably, is sufficient to support "an inferential case" of discrimination for purposes of Title VII. *Id.* (internal quotations omitted.) In this Circuit, the rule or policy violations are considered to be of "comparable seriousness" for cases in which the proposed comparator "engaged in similar—not identical—conduct . . . ." *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis,* 510 F.3d 681, 689 (7th Cir. 2007).

In order to support her claims of discrimination based upon her religion and national origin, Alrazzaq therefore must present evidence that similarly-situated employees, who were non-Muslim and/or non-Palestinian, committed acts of "comparable seriousness" at the same pharmacy, yet were not terminated by Krynski, the supervisor who terminated Alrazzaq, for their misconduct. To meet this burden, Alrazzaq argues that there were forty other Pharmacists and

Pharmacy Managers who were disciplined for prescription errors but were not terminated, and focuses upon seven individuals out of the forty as exemplars. (Pl.'s Resp. 13-14.)

For those seven individuals, Alrazzaq provides the following information: their names; their job titles; a brief description of the type of errors they committed; the levels of corrective discipline they were subject to; the dates of such action; and the fact that Krynski was the District Supervisor who signed off on the corrective discipline for each.[6] (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 31-39.) However, Alrazzaq fails to provide any information regarding their religion, national origin, and whether any mitigating circumstances would have warranted a lesser punishment in those situations. Without such information, the Court is hampered from analyzing whether these individuals were "directly comparable in all material respects" as required in this Circuit. *Sartor v. Spherion Corp.,* 388 F.3d 275, 279 (7th Cir. 2004). In particular, the Court simply cannot determine whether any of the seven individuals are proper comparators for the purpose of Alrazzaq's discrimination claims based on either national origin or religion because Alrazzaq wholly fails to provide any information as to their religion or national origin. Alrazzaq's religion and national origin claims therefore cannot be substantiated via evidence of similarly-situated employees.

### B. Pretextual/Suspicious Timing or Ambiguous Statements

Alrazzaq's religion and national origin claims may still survive, if she can show Walgreen's reasons for terminating her were pretextual and designed to obscure its intent to discriminate against her as a Palestinian and/or as a Muslim. Pretext is often demonstrated by

---

[6] Although Alrazzaq suggests that a number of the forty other Pharmacists and Pharmacy Managers who were disciplined but not terminated also serve as potential comparators, Alrazzaq does not provide any specific information regarding them in her Local Rule 56.1(b)(3)(C) statement and the Court need not consider them here. *See Albrechtsen v. Bd. of Regents of Univ. of Wisc. Sys.,* 309 F.3d 433, 436 (7th Cir. 2002) (internal citations and quotations omitted) ("Judges are not like pigs, hunting for truffles buried in the record.").

citing to incidents displaying suspicious timing or ambiguous statements, and thus, the Court discusses these two forms of proof together. *Coleman*, 667 F.3d at 862. To demonstrate pretext, Alrazzaq must establish that Walgreen's "proffered reasons" for her termination are "not credible . . . by demonstrating that the reasons are factually baseless, were not the actual motivation for the discharge, or were insufficient to motivate the discharge." *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999).

Here, Walgreen has put forth evidence that it terminated Alrazzaq because she failed to complete the Zostavax training but warranted that she had done so, and that this failure led to her immunization errors. (Def.'s LR 56.1(a)(3) Stmt. ¶¶ 29-33; 36-40; 42-43; 44-46; 48-49.) The burden therefore shifts to Alrazzaq to demonstrate that these reasons were not the true basis for her termination. Here, the core of Alrazzaq's pretext argument is that her behavior was not materially different than other Pharmacists who committed multiple errors but were not terminated. As explained, however, Alrazzaq has put forth no facts regarding the religion or national origin of those other Pharmacists. Instead, the only contention that Alrazzaq makes regarding either religion or national origin is that, at some indeterminate date during Ramadan, she had requested to take a later break in order to eat, and Krynski had told her that she could take her break after sundown only if the Pharmacy was not busy at the time. (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 2.) Walgreen does not dispute this contention. (Def.'s Resp. LR 56.1(b)(3)(C) Stmt. ¶ 2.)

"[T]o be probative of discrimination, isolated comments must be contemporaneous with the discharge or *causally related* to the discharge decision making process." *Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir. 1996) (emphasis added). However, Alrazzaq fails to provide any evidence that the conversation with Krynski regarding Ramadan happened at a time close to or

contemporaneous with her termination.[7] In fact, there is nothing in the record at all indicating when this conversation took place, although it is undisputed that Alrazzaq worked at Walgreen for more than ten years. (Def.'s Local Rule 56.1(a)(3) Stmt. ¶¶ 4, 6.) More importantly, however, there is not even an inkling of a suggestion in the record that Alrazzaq's observance of Ramadan factored into Walgreen's decision to terminate her for the conduct outlined above. Alrazzaq's religion and national origin claims cannot survive based solely on so slender a reed.

In short, with regard to her religion and national origin claims, Alrazzaq has failed to provide any evidence that similarly-situated individuals of different ethnicities or religions were treated differently or that she was terminated for a prextual reason. The Court therefore finds that Alrazzaq's religious and national origin discrimination claims cannot survive under the direct method of proof.

### C.    Indirect Method

In order for Alrazzaq to establish a *prima facie* case of religious or national origin discrimination using the indirect method, she must establish that she (1) "belongs to a protected class"; (2) was meeting Walgreen's "legitimate expectations"; (3) "suffered an adverse action"; and (4) was "treated worse than similarly-situated employees outside the protected class." *Lewis*, 367 Fed. Appx. at 685. However, for the reasons set forth above, Alrazzaq has failed to identify any similarly-situated employees outside of her protected class that were treated more favorably than she, and thus, cannot establish a *prima facie* case of discrimination for her religion and national origin claims. As a result, the burden does not shift back to Walgreen to establish a legitimate and non-discriminatory reason for her termination, nor, in turn, does the

---

[7] Assuming for the sake of argument that this incident took place within a year of Alrazzaq's termination in April 2012, in 2011, Ramadan took place in the month of August, while in 2012, it took place in July and August, neither of which is close in time to the date of Alrazzaq's firing.

burden revert to Alrazzaq to demonstrate that Walgreen's articulated reason was merely pretextual. Because Alrazzaq cannot satisfy her burden of proof via the indirect method, the Court may not find in her favor on this alternate basis. Thus, the Court grants summary judgment to Walgreen as to Counts I and III of Alrazzaq's Complaint.

## II. Gender

The Court next turns to Alrazzaq's gender discrimination claim.

### A. Similarly-Situated Employees

As seen, if Alrazzaq can present evidence that similarly-situated employees, who were either male or female but not pregnant, committed acts of "comparable seriousness" at the same pharmacy, yet were not terminated by Krynski, her gender discrimination claim will survive summary judgment under the direct method. Unlike her religion and national origin claims, Alrazzaq here provides sufficient information to allow the Court to infer the gender of the seven identified comparators.[8] Of the seven, two are female, while five are male. While the female employees could potentially be valid comparators to support Alrazzaq's claim that she was discriminated against on the basis of her pregnancy, the record contains no indication of whether they were pregnant, had been pregnant while employed at Walgreen, or even whether they were of child-bearing age. The two women are therefore not valid comparators for the purposes of this motion. As for the five men, to qualify them as valid comparators, Alrazzaq must establish that they committed infractions of comparable seriousness. As set forth below, genuine questions of fact exist as to whether these individuals committed comparably serious errors, but were not fired.

---

[8] While not specifically stating the gender of each of the seven, Alrazzaq does refer to them as "Mr." or "Ms.," so the Court will take judicial notice that "Mr." is commonly understood to refer to a male while "Ms." is commonly understood to refer to a female. Fed. R. Evid. 201.

J.G., a male Pharmacist, is alleged to have committed what are described as "prescription errors of data review and product review." (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 33.) J.G. was placed in the Step Approach constructive discipline process; he subsequently received verbal counseling and a written warning; and he was eventually placed in Final Written Review. (*Id.*) There is no indication in the record that J.G. was terminated by Walgreen.

O.B., also a male Pharmacist, is alleged to have committed certain errors, at least in part related to "data review." (*Id.* ¶ 34.) The file contains a direction that he should open bottles and view their contents prior to dispensing drugs. (*Id.* ¶ 34.) O.B. was placed in the Step Approach constructive discipline process after a PreStep One quality awareness conversation. (*Id.*) He subsequently received verbal counseling and a written warning. (*Id.*) There is no indication in the record that O.B. was terminated by Walgreen.

E.G., a male Pharmacy Manager, is alleged to have committed certain errors, at least in part related to "data review." (*Id.* ¶ 35.) The file contains a direction that he should look at the prescription before reviewing the information the Pharmacy Technician entered and to verify that the prescription is correct. (*Id.*) He was also disciplined for dispensing a wrong bottle and bag. (*Id.*) E.G. was placed in the Step Approach constructive discipline process after a PreStep One quality awareness conversation and subsequently received verbal counseling. (*Id.*) There is no indication in the record that E.G. was terminated by Walgreen.

C.S., a male Pharmacist, is alleged to have committed certain errors, at least in part related to "data review." (*Id.* ¶ 37.) The file contains a direction that he should look at the prescription before reviewing the information the Pharmacy Technician entered and to verify that the prescription is correct. (*Id.*) C.S. was placed in the Step Approach constructive discipline

process after a PreStep One quality awareness conversation and subsequently received verbal counseling. (*Id.*) There is no indication in the record that C.S. was terminated by Walgreen.

Finally, K.O. also a male Pharmacist, was assigned a training program for verification of prescriptions in order to reduce prescription medication errors. (*Id.* ¶ 38.) K.O. was placed in the Step Approach constructive discipline process after a PreStep One quality awareness conversation. (*Id.*) He subsequently received verbal counseling and a written warning. (*Id.*) There is no indication in the record that K.O. was terminated by Walgreen.

Walgreen, for its part, contends that Alrazzaq was not terminated for simply making errors, but for intentionally misrepresenting that she had completed the Zostavax training, which led to her errors. In this vein, Krynski testified that most participants in the Step Approach program were being disciplined for making simple errors such as failing to verify that a customer's prescription information was correct in the database or dispensing the wrong bag. (*See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 32-39.) But Krynski also testified that errors relating to dispensing the "wrong drug" (including immunizations) at the "wrong strength" to the "wrong person" could in some instances warrant placement in the Step Approach program rather than the constructive discipline program. (Krynski Dep. at 69-72.) What is more, according to Krynski, the determination of whether a pharmacist is placed in the Step Approach for committing such errors is evaluated on a case-by-case basis. (*Id.* at 57, 58.)

Here, when all disputed facts are viewed in Alrazzaq's favor, a reasonable jury can infer that the event that triggered her termination was the fact that she had administered the wrong drug (Zostavax) to the wrong person (the Store Manager). She did this, according to Alrazzaq (which we have to consider as true for present purposes), because the Pharmacy Manager told her that the protocols related to Zostavax were "basically the same" as immunizations that she

was familiar with. When these facts are considered in conjunction the male comparators, who were placed in the Step Program and not terminated for similar errors, and the discretion employed by Walgreens to determine whether a person who gives the "wrong drug" to the "wrong person" is enrolled in the Step Program or fired, the Court finds that genuine issues of material fact exist to preclude summary judgment as to Alrazzaq's gender discrimination claim (Count II). *See*, *e.g.*, *Perez v. Thorntons, Inc.*, 731 F.3d 699, 705 (7th Cir. 2013) (whether comparator's "misconduct was comparable [was] a genuinely disputed issue of material fact").

### Conclusion

For the reasons set forth above, Defendant Walgreen Company's motion for summary judgment [dkt. 29] is granted in part and denied in part. Judgment is entered in favor of Walgreen Company on Counts I and III of Plaintiff Maryam Alrazzaq's Complaint. The motion is denied as to Count II.

SO ORDERED                                    ENTERED

_____
John Z. Lee
United States District Judge

Date: 3/21/14